FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ JUN 17 2005 ★
P.M. _____
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

MUSHAHADA INTERNATIONAL USA, INC.,

                Plaintiff,

-against-

ACCESS POINT, INC.,

                Defendant.

-------------------------------------------------------------- X

04 CV 5270 (ARR)

<u>NOT FOR ELECTRONIC OR PRINT PUBLICATION</u>

<u>OPINION AND ORDER</u>

ROSS, United States District Judge:

Plaintiff Mushahada International USA, Inc. ("plaintiff" or "Mushahada") brought this action for breach of contract against defendant Access Point, Inc. ("defendant" or "Access Point") on November 2, 2004. Defendant thereafter counterclaimed, alleging a cause of action, inter alia, for fraud in the inducement, and removed the case to federal court. Plaintiff now moves to dismiss Access Point's counterclaim for fraud in the inducement, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff argues that: (1) defendant's fraud counterclaim duplicates its counterclaim for breach of contract; (2) defendant has failed to plead the fraud claim with sufficient particularity and has stated no facts from which scienter could be inferred; (3) it made no false statement; and (4) defendant did not justifiably rely on plaintiff's representations. For the reasons stated below, plaintiff's motion to dismiss the counterclaim is denied.

## BACKGROUND

The facts alleged in Access Point's Amended Answer and Counterclaim ("Counterclaim") are as follows. In December 2003 or January 2004, Mushahada approached Access Point asking to purchase domestic and international telecommunications services. On January 17, 2004, Imran Tahir, Mushahada's Chief Operating Officer, emailed an Access Point retail account representative requesting rates for domestic long distance telecommunications services and for international service to Canada, the United Kingdom, Mexico, and India. In that email, Tahir described Mushahada as a company that "has been providing customer care solutions for Fortune 500 companies since 25 years ago." Counterclaim ¶ 5. Tahir further stated that Mushahada was "trying to offer outbound telecare services." Id. Finally, Tahir represented in the email that Mushahada would purchase approximately $10,000 of services from Access Point per month. Id. Access Point understood Tahir's email to indicate that Mushahada provided telecommunications support and call center services, such as telemarketing services, to business customers and that Mushahada was an end user of telecommunications services. Tahir did not indicate that Mushahada was a reseller of international telephone service, inquire about Access Point's rates for international calls to mobile phones, disclose an intent to terminate international traffic to mobile phones, or disclose an intent to generate high volumes of traffic. Id. ¶ 7.

On approximately January 28, 2004, Access Point approved a special pricing request ("SPR") for Mushahada proposing that domestic interstate and intrastate long distance telephone calls be billed at 2.9 cents and 3.7 cents per minute, respectively. No rates for international calls were included in the SPR, but Access Point determined that Mushahada would be charged Access Point's standard rates for international calls. Access Point maintained standard rate

schedules for such calls on its website. Id. ¶ 10. Access Point informed Mushada that these rates would apply to international landline traffic and that a fifteen cent per minute surcharge would apply if more than ten percent of traffic terminated to mobile phones. Id. ¶ 15.

Access Point entered into a Commercial Service Agreement ("CSA") with Mushahada on February 2, 2004 and a Service Authorization on February 4, 2004, through Mushahada's CEO Sudhir Joshi. Id. ¶ 12. These documents constituted the contract between Mushahada and Access point. The contract established a two-year term beginning in February 2004 and provided the rates previously negotiated by the parties, reflected in the SPR. No rates for international calls appeared in either document. Id. The CSA was a standard retail contract which Access Point enters into with end users of telecommunications services and differs from wholesale service contracts entered into with resellers of telecommunications services, which are negotiated and customized agreements.[1] Id. ¶ 13. On February 2, 2004, Joshi executed a letter of agency empowering Access Point to purchase telecommunications services from other carriers on Mushahada's behalf. Id. ¶ 14.

As part of its standard procedure, Access Point ran a Dunn & Bradstreet credit search on Mushahada on February 6, 2004. The report indicated that Mushahada had a good credit rating, was timely on its service payments, and was classified as "Wholesales General Merchandise." Id. ¶ 17. Access Point also visited Mushahada's website, which described the company as a provider of computer services to small business and did not indicate that the company provided international telephone services. Id. ¶ 18.

---

[1] Access Point has only one wholesale agreement with a reseller of telecommunications services, which was negotiated by Access Point's CEO. Counterclaim ¶ 35.

3

Mushahada began using Access Point's services in March 2004. Mushahada generated no telecommunications traffic in March and April of 2004. Id. ¶ 19. Toward the end of May 2004, Mushahada generated a modest volume of domestic calls. Id. ¶ 21. While Access Point initially noticed nothing unusual in Mushahada's June 2004 activities, it later determined that substantially all of the $1,800 in billed service involved international calls to mobile telephones. Id. Because Access Point had failed to determine the nature of this traffic, it had invoiced Mushahada according to the standard international landline rates.

At the end of July 2004, Access Point received a bill from the carrier that provided it international service.[2] The bill showed a large number of international calls terminating to mobile telephones, prompting Access Point to scrutinize Mushahada's traffic. Access Point learned that over 90% of Mushahada's traffic involved international calls to mobile telephones. Id. ¶ 22. In August 2004, Access Point indicated to Mushahada that it had recognized a shift in traffic patterns, that Mushahada had been incorrectly invoiced, and that future invoices would reflect the correct rates. Id. ¶ 26. Mushahada had generated a spike in traffic in July 2004, resulting in an August 7, 2004 invoice for $278,784.15. Id. ¶ 28.

On August 4, 2004, Access Point emailed Mushahada its standard rate schedule for international calls terminating to mobile phones, and Access Point provided notice of this new list in its September 7, 2004 invoice. Id. ¶ 27. On August 12, 2004, Access Point learned that

---

[2] Access Point does not own international facilities and purchased international services for its clients from other providers. These providers charged Access Point a surcharge for calls terminating to mobile phones, and Access Point determined that it would have to invoice Mushahada at rates including a fifteen cent per minute surcharge for such calls. Counterclaim ¶¶ 24-25. On July 15, 2004, Access Point posted on its website a standard price list for international calls to mobile phones, including that surcharge. Id. ¶ 25.

4

Mushahada had changed its classification with Dunn & Bradstreet to "Line of business: Telecommunications, long distance" on May 12, 2004. Id. ¶ 32.

## DISCUSSION

I. Motion to Dismiss Standard

In deciding a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true material facts alleged by the counterclaimant and construe all reasonable inferences in favor of the nonmoving party.[3] Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995). Such a motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, as "[t]he issue is not whether a [claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) (internal quotation marks and citation omitted). A complaint should be dismissed under Rule 12(b)(6) only if "it appears beyond doubt that the [counterclaimant] can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Stated differently, the court can dismiss the counterclaim only if, assuming all facts alleged in the Counterclaim as true, Access Point has failed to plead the basic elements of fraud in the inducement.

II. Fraud

A. Pleading Standard

Fed. R. Civ. P. 9(b) states that fraud allegations must be stated with particularity, except that scienter, or intent, may be averred generally. To state a claim with the required particularity,

---

[3]The standards for dismissing claims under Rule 12(b)(6) are identical to the standards for dismissing counterclaims. MTV Networks, A Division of Viacom Int'l, Inc. v. Curry, 867 F.Supp. 202, 203 (S.D.N.Y. 1994) (citation omitted).

5

a complainant must: (1) specify the statements that the party contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995) (quotation marks and citations omitted). The purpose of the rule is to provide a party with fair notice of the claim, to protect the party's reputation against improvident charges of wrongdoing, and to protect parties against strike suits. See O'Brien v. National Property Analysts Partners, 936 F.2d 674 (2d Cir. 1990).

Plaintiffs are permitted to demonstrate the scienter element by inference, but they must plead a factual basis which gives rise to a strong inference of fraudulent intent. Id. This rule "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990). Facts giving rise to an inference of scienter may be alleged on information and belief only if they lie "peculiarly within the opposing party's knowledge." Id. Typically, a complaining party must allege facts showing a motive for committing fraud and a clear opportunity for doing so or identify circumstances indicating conscious behavior by the party. Ruff v. Genesis Holding Corp., 728 F.Supp. 225, 228 (S.D.N.Y. 1990) (internal quotation marks and citation omitted).

B.  Elements of Fraud under New York Law

"Fraud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment, are different causes of action and demand different elements of proof

under New York law."[4] Congress Financial Corp. v. John Morrell & Co., 790 F.Supp. 459, 469 (S.D.N.Y. 1992).

### 1. Fraudulent Misrepresentation

To prove actual fraud under New York law, a complaining party must show that: (1) the party made a material false statement, (2) with knowledge of its falsity, (3) the party intended to defraud the complaining party thereby, (4) the complaining party justifiably or reasonably relied upon the representation, and (5) the complaining party suffered damage as a result of such reliance. Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir. 2000). Mere puffery or opinions as to future events do not state a claim for fraud. Id. Where a concrete misrepresentation is made, however, it will support a fraud claim. Id.

"[Justifiable] reliance is an element of . . . common law fraud under New York law." Pail v. Precise Imports Corp., No. 99 Civ. 1624 (DLC), 1999 WL 681384, *2 (S.D.N.Y. Aug. 31, 1999) (citations omitted). Under New York law, "the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud." Belin v. Weissler, No. 97 Civ. 8787 (RWS), 1998 U.S. Dist. LEXIS 10492, *14 (S.D.N.Y. July 14, 1998) (internal quotation marks and citations omitted). It is well established that "if plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980) (internal quotation marks and

---

[4]Both parties assume that New York law governs the tort counterclaim in this diversity case, and their "consent concludes the choice of law inquiry." Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997).

citations omitted). "Ordinarily there is no duty to exercise due diligence, and cases following Mallis have described the necessary showing of care as 'minimal diligence' or 'negating its own "recklessness".'" Banque Franco-Hellenique de Commerce v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997). Courts impose a more stringent standard on sophisticated parties, holding that they have a duty to obtain available information material to investment decisions once put on notice of the existence of such information. See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997). Similarly, when the complaining party "was placed on guard or practically faced with the facts when entering a transaction, courts require a heightened degree of diligence." Banque Franco-Hellenique de Commerce, 106 F.3d at 27 (internal quotation marks and citation omitted). In contrast, when matters are peculiarly within the knowledge of the non-complaining party, the complaining party may rely on representations without conducting an investigation. Mallis, 615 F.2d at 80. "[R]ecovery is not barred merely because [the complaining party] was negligent in [its] reliance." Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 278 (2d Cir. 1992).

2. Fraudulent Concealment

The elements of fraudulent concealment under New York law are: (1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) nondisclosure; (4) scienter; (5) reliance; and (6) damage. Congress Financial Corp., 790 F.Supp. at 472. Thus, under New York law, a fraud claim may be based on a material omission when the omitting party has a duty to speak. Buy This, Inc., 209 F.Supp.2d at 338-39 (finding a duty to speak based on "superior knowledge") (citations omitted).

8

New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993) (internal quotation marks and citations omitted).

The Second Circuit has noted the "tendency in New York to apply the rule of 'superior knowledge' in an array of contexts in which silence would at one time have escaped criticism. It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when . . . he would reasonably expect a disclosure." PdP Parfums de Paris, 901 F.Supp. at 586 (citing Brass, 987 F.2d at 151 (internal quotation marks and citations omitted). Three elements must be shown to invoke the superior knowledge doctrine: (1) one party must have superior knowledge; (2) that knowledge must not be readily available to the other party; and (3) the party with the knowledge must know that the other party is acting on the basis of mistaken knowledge. Congress Financial Corp., 790 F.Supp. at 473 (citing Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir. 1984)). Where the parties have equal opportunity to obtain information, such information is "readily available," and each party is expected to protect itself in a business transaction. Brass, 987 F.2d at 151. A party is not expected, however, to "unearth facts and defects that are present but not manifest." Id.

C. <u>Duplicative Claims</u>

An action for breach of contract may not be converted into one for fraud merely by alleging that the contracting party never intended to meet his contractual obligation, for this would allow a plaintiff to plead two independent claims, and recover twice, for the same conduct. See, e.g., Blank v. Baronowski, 959 F.Supp. 172, 180 (S.D.N.Y. 1997). While a plaintiff may not "'dress up' a breach of contract claim as a fraud claim, a valid fraud claim may be premised on misrepresentations made before the formation of the contract that induced the [complaining party] to enter the contract." Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994). The Second Circuit has explained that, to sustain a fraud claim in cases potentially involving both fraud and breach, a complaining party must: (1) demonstrate a legal duty separate from the duty to perform under the contract; (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages. Bridgestone/ Firestone Inc. v. Recovery Credit, 98 F.3d 13, 20 (2d Cir. 1996). "A misrepresentation of present fact, which is collateral or extraneous to the terms of the parties' original agreement and is used as an inducement to get [a party] to enter into another contract, can be the basis for a fraudulent inducement claim." Miramax Film Corp. v. Abraham, No. 01 Civ. 5202 (GBD), 2003 U.S. Dist. LEXIS 21346, *33-34 (S.D.N.Y. Nov. 25, 2003) (citing Deerfield Communications Corp. V. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956 (1986)). A cause of action for fraud in the inducement, however, cannot be based solely upon the failure to perform the promises of future acts which constitute the contractual obligations themselves. Value Time, Inc. V. Windsor Toys, Inc., 700 F.Supp. 6, 7 (S.D.N.Y. 1988). Stated differently, "where [the complaining party] is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." Spanierman v. Love, No. 03 Civ. 3188 (VM),

2003 WL 22480055, *3 (S.D.N.Y. Oct. 31, 2003) (internal quotation marks and citations omitted).

## III. Merits of Plaintiff's Arguments

As a preliminary matter, the court notes that while plaintiff has moved to dismiss Access Point's second counterclaim in its entirety, its brief only explicitly addresses defendant's fraudulent misrepresentation claim, and not the claim based on Mushahada's omission of material facts. Defendant identified three material omissions in its Counterclaim: (1) that Mushahada would primarily generate international telecommunications traffic; (2) that Mushahada would primarily generate international traffic terminating to mobile phones; and (3) that Mushahada would generate over $250,000 of traffic in a single month. Counterclaim ¶ 54. While plaintiff obliquely invoked the "superior knowledge" doctrine in its discussion of reasonable reliance in its reply brief, Plaintiff's Reply Brief at 6, the court does not understand that veiled reference as a challenge to defendant's fraudulent concealment claim.

### A. Duplicative Claims

Plaintiff contends that Access Point's fraud in the inducement claim merely restates its breach of contract claim and, as a result, that it cannot be sustained. The court does not agree. As a preliminary matter, plaintiff suggests that because defendant did not allege either the existence of a fiduciary duty or special damages, the fraud claim repackages the breach claim. This misstates the law. The Second Circuit clearly indicated in Bridgestone/ Firestone Inc. that allegations of a misrepresentation of present fact that is collateral or extraneous to the contract can, on its own, support a fraud claim. 98 F.3d at 20. The alleged misrepresentation in the instant case is not an example of the prototypical duplicative claim, where the alleged

11

misrepresentation is an intentionally false statement indicating an intent to perform under the contract. Rather, the alleged misrepresentation in this case involves the nature of Mushahada's business and the type and quantity of services it would purchase from Access Point. Simply stated, Access Point's claim is not a claim to secure performance of the contract repackaged as a tort action. Thus, it does not duplicate defendant's counterclaim for breach.

B. Particularity of the Pleading

Plaintiff argues that defendant's fraud claim fails to satisfy the pleading requirements of Fed. R. Civ. P. 9(b). Plaintiff first contends that defendant has failed to allege the time, place, and circumstances of each allegedly fraudulent statement and that defendant has failed to identify the person to whom such statements were communicated. Access Point has identified four alleged misrepresentations. Counterclaim ¶ 53. Three of these statements were included in the January 17, 2004 email from Tahir to an Access Point representative. The court finds it to be beyond dispute that Access Point has satisfied Rule 9(b)'s requirement that the circumstances of the alleged fraud be stated with particularity.

The court further finds that Access Point pled a sufficient factual basis to support an inference of scienter, rather than basing its claim on speculation and conclusory allegations. Mushahada identifies itself as a reseller of telecommunications services and does not contradict defendant's claim that it never told Access Point that it was, in fact, a reseller. Rather, Mushahada argues that the statements in the January 17, 2004 email were not false and were, at worst, ambiguous. Having determined, as discussed below, that whether or not those statements were false is a question of fact, the court finds that defendant has pled sufficient facts to support an inference of scienter. It is not disputed that Mushahada is a reseller of

telecommunications services, and, drawing all reasonable inferences in favor of Access Point, the court must assume for purposes of plaintiff's motion to dismiss that the January 17, 2004 email made representations to the contrary. Drawing the inferences as it must, the court concludes that these allegations are sufficient to support an inference of scienter.

C. Existence of a False Statement

In its reply brief, Mushahada contends that Access Point has not identified any statements that "could reasonably be construed as fraudulent." Plaintiff's Reply Brief at 6. Even assuming arguendo that the only properly pleaded affirmative misrepresentations by Mushahada are the statements in Tahir's January 17, 2004 email, the court cannot conclude as a matter of law that Mushahada did not make a material false statement. That the statements identified by Access Point are at least ambiguous to a person not employed in the telecommunications industry makes clear that plaintiff has raised an issue of fact more properly the subject of a summary judgment motion.

D. Justifiable Reliance

Finally, plaintiff argues that Access Point's fraud claim is based on its interpretation of the phrases "customer care solutions for Fortune 500 companies" and "outbound telecare services" in the January 17, 2004 email. Plaintiff contends that Access Point did not justifiably rely on these statements in determining that Mushahada was a retail company and not a reseller of telecommunications services. "Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." Doehla v. Wathne Ltd., Inc., No. 98 Civ. 6087, 1999 WL 566311, *10 (S.D.N.Y. Aug. 3, 1999) (citation omitted).

13

Mushahada relies on a single proposition to argue that Access Point's reliance was unreasonable or unjustifiable as a matter of law. Plaintiff states that defendant never asked it to confirm whether it was in fact an end user of telecommunications services rather than a reseller and did not conduct other due diligence to determine the nature of Mushahada's business. In its reply brief, plaintiff indicates that it registered with the Federal Communications Commission as a reseller of telecommunications services approximately eight months before entering into the contract with Access Point, making the information about its business accessible to Access Point.

While, in certain circumstances, whether a party has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss, Granite Partners, L.P. v. Bear Stearns & Co., 58 F.Supp.2d 228, 259 (S.D.N.Y. 1999), the court finds the question in the instant case to be too fact-laden to be resolved at this stage of the proceedings. Defendant was not "put on guard or practically faced" with facts that would give rise to a heightened degree of diligence before it entered into the contract with Mushahada, and the court is not prepared to conclude, assuming the facts alleged by defendant to be true and drawing all reasonable inferences in its favor, that Access Point had available the means of ascertaining the truth about the nature of Mushahada's business. The court thus concludes that defendant has sufficiently pleaded reliance.

## CONCLUSION

For the foregoing reasons, plaintiff Mushahada's motion to dismiss defendant Access Point's counterclaim for fraud in the inducement is denied.

SO ORDERED.

/s/ Allyne R. Ross
Allyne R. Ross
United States District Judge

Dated: June 15, 2005
Brooklyn, New York

SERVICE LIST:

>Attorney for Plaintiff
>Joseph Paul Goldberg
>Bondy & Schloss, LLP
>60 East 42nd Street, 37th Floor
>New York, NY 10165
>
>Attorney for Defendant
>Jonathan K. Cooperman
>Kelley Drye & Warren LLP
>101 Park Avenue
>New York, NY 10178

cc: **Magistrate Judge Joan M. Azrack**